*158 ORDER AFFIRMING TRIBAL COUNCILS’ FINDINGS AND OPINION
SIDNEY LEZAK, Pro Tem Judge.
I. BACKGROUND
This matter arises out of Petitioner’s temporary suspension from the Tribal Council (“Council”) stemming from claims that Petitioner improperly threatened and intimidated Tribal member Jan Michael Reibach during certain encounters the two men had in the spring of 2001.[1] Pursuant to the Tribe’s Ethical Standards Ordinance (“TESO”), Mr. Reibaeh’s complaints were presented to a Hearings Officer, former Yakima Tribal Court Chief Judge Rory SnowArrow Flint Knife. Following a lengthy evidentiary hearing on December 18, 2001, at which Petitioner was represented by counsel and presented wit *159 nesses, Judge Flint Kniie issued a comprehensive 23-page opinion, concluding that Petitioner had committed three separate violations of TESO and recommending a seven month suspension.[2] Thereafter, on January 30, 2002, the Council, by a vote of 5-2, passed Resolution 028-02, imposing the recommended seven-month suspension without pay. Council Members Larsen and Grout voted against the suspension.
On April 10, 2002, all five voting Members of the Council—including Council Members Larsen and Grout—voted to vacate Resolution 028-02 and passed a new resolution (Resolution 064-02), reducing the duration of the suspension from seven months to five. Council Members Reibach and Leno abstained from that vote. The Council took that action because, as reflected in Resolution 064-02, “the controversy [surrounding Petitioner’s suspension] ha[d] created hostility between Tribal members and [the Council determined] that it [was] in the Tribe’s best interest that the Council reconsider Resolution No. 028-02.” Council Member Larsen (who had previously voted against the seven-month suspension) moved to adopt the new resolution, and Ms. Grout seconded the motion.
Petitioner filed timely appeals from both Resolution 028-02 and Resolution 0(54-02 under TESO. This Court consolidated Petitioner’s appeals and he filed his Opening Brief and supporting materials on August 9, 2002. The Opening Brief asserted six individual “assignments of error.” The Council moved to strike certain issues raised in Petitioner’s Opening Brief as well as underlying portions of the record submitted by Petitioner relating to these issues. By Order dated November 5, 2002, the Court granted in substantial part the Council’s motion to strike and granted Petitioner leave to file an “amended” opening brief, to conform to the narrowed record that remained following the Council’s motion to strike. The November 5 Order further instructed Petitioner that, with one narrow exception, he was not to raise any issue in his Amended Brief that was not raised in the Opening Brief.[3]
On October 23, 2002, Petitioner filed his “Amended Brief” which, notwithstanding the Court’s rulings, contained eight individual “assignments of error,” including several issues that had not been raised before.[4] The crux of Petitioner’s appeal is *160 that he was denied due process in connection with the proceedings surrounding the Council’s adoption of Resolutions 028-02 and 064-02. He does not challenge the Hearing’s Officer’s factual findings or the testimony upon which those findings were based, nor does he deny that he engaged in the conduct upon which the sanctions were based. For the reasons set forth below, the Court has concluded that it is appropriate to deny Petitioner’s appeal and uphold the Tribal Council’s action.
II. STANDARD OF REVIEW
This Court has previously recognized that “[t]he Tribe’s interest in governing the ethical conduct of its own Council Members is a compelling one, going to the heart of Tribal sovereignty and self-government.” In the Matter of Rey n Leno, 27 ILR 6213, 6216 (2000). “The Tribal Council must have the authority and the freedom to establish standards governing the conduct of its members.” Id. (quoting Brandon v. Tribal Council for the Confederated Tribes of the Grand Ronde Cmty. of Oregon, 18 ILR 6139, 6140 (1991)).
Accordingly, in reviewing the Council’s sanction decisions, this Court’s authority is limited “to determining whether the action taken was arbitrary and capricious, in violation of the Tribe’s Constitution or of the Indian Civil Rights Act.” Tribal Code § 275(c)(2)(I); see also Leno, 27 ILR at 6214; Brandon. 18 ILR 6139. The arbitrary and capricious “standard of review ‘is narrow and the reviewing Court may not substitute its judgment for that of the [Council].’ ” Leno, 27 ILR at 6214 (quoting O’Keeffe’s, Inc. v. U.S. Consumer Prod. Safety Comni’n, 92 F.3d 940, 942 (9th Cir.1996)). The Court “must only find that the [Council’s] decision has a rational basis to uphold it.” Brandon, 18 ILR 6139, and the Council’s decisions generally “should not be set aside by the Court unless the evidence heard before the Council was clearly insufficient to support its decision,” Leno, 27 ILR at 6215 (citing Brandon, 18 ILR 6139).
With respect to claims of violations of the Tribe’s Constitution or of the Indian Civil Rights Act, absent direct evidence to the contrary, there is a strong presumption that administrative decision-makers act objectively and impartially. See, e.g., Schweiker v. McClure, 456 U.S. 188, 102 S.Ct. 1665, 72 L.Ed.2d 1 (1982); Committee of 100 on Federal City v. Hodel, 777 F.2d 711, 721 (D.C.Ch.1985). Indeed, “in the context of Tribal governments,” a party asserting a due process violation must surmount an even steeper burden than usual, “especially where it involves regulation of the Tribe’s own Council members.” Leno, 21 ILR at 6216 (citing Stands Over Bull v. Bureau of Indian Affairs, 442 F.Supp. 360 (D.Mont.1977)).
III. ANALYSIS
A. Assignment oí Error No. 1: Whether Resolution-02802 was Void or Voidable As a Result of Council Member ‘Reibach’s Alleged Conflict of Interest.
In his first assignment of error, Petitioner argues that the January 30 i evolution was invalid because Council Member Reibach, who voted in favor of the resolution, allegedly had a disqualifying conflict of interest. Petitioner contends that TESO precluded Council Member Reibach from voting on a resolution involv *161 ing an ethics complaint that was initiated by his son. The Court, however, need not decide whether Council Member Reibach had a disqualifying conflict of interest. Even assuming arguendo that he did, the conflict could not invalidate the sanctions against Petitioner. This is because any lingering issues surrounding the Council’s adoption of Resolution 028-02 were rendered moot by the Council’s subsequent April 10 vote—in which Mr. Reibach did not participate—adopting Resolution 064-02.
 “To remain a justiciable controversy, a suit must remain alive throughout the course of litigation, to the moment of final appellate disposition.” Bahnmiller v. Derwinski, 923 F.2d 1085 (4th Cir.1991) (quotation omitted). Agencies and legislatures have the inherent authority to vacate previously issued orders, resolutions, and statutes, thereby mooting pending litigation relating thereto. See, e.g., Climax Molybdenum Co. v. Secretary of Labor, 703 F.2d 447 (10th Cir.1983); cf. Diffenderfer v. Central Baptist Church of Miami, Florida, Inc., 404 U.S. 412, 92 S.Ct. 574, 30 L.Ed.2d 567 (1972); Bahnmiller, 923 F.2d at 1089; Friends of Keeseville, Inc. v. FERC, 859 F.2d 230, 232 (D.C.Cir.1988); Taylor v. United, States, 528 F.2d 60, 64 (7th Cir.1976). The Tribal Council exercised that inherent authority by adopting Resolution 064-02, thereby expressly “vacating] Resolution No. 028-02,” and imposing upon Mr. Pearsall a lesser sanction than contemplated by the earlier resolution.[5] As a result, Petitioner’s objection to the January 30 resolution is deprived of its “character as a present live controversy of the kind that must exist if [the Court is] to avoid advisory opinions on abstract propositions of law.” Diffenderfer, 404 U.S. at 414, 92 S.Ct. 574 (quotation omitted); see also American Fed’n of Musicians v. FCC, 356 F.2d 827, 830 (D.C.Cir.1966) (“the judicial function is best served” by limiting review of agency actions “to only those questions necessary to decide the case”). Allegations of improprieties surrounding Resolution 028-02 are therefore moot.[6]
B. Assignment of Error No. 2: Whether Resolution-06402 is Void Due to Alleged Procedural Irregularities Relating to the Council’s April 10, 2002 Special Meeting.
Petitioner’s second assignment of error contends that the Council’s April 10, 2002 Special Meeting “was not lawfully convened, noticed or conducted and the resolution of April 10th is void.” As discussed previously, at the April 10 meeting, Council passed Resolution 064-02 by a vote of 5-0, with Council Members Reibach and Leno abstaining. The new resolution “va-catefd] Resolution No. 028-02 and impose[d] a sanction of five-month suspension without pay, such sanction to be deemed to have commenced running as of January 30, 2002,” The Council upheld the Hearings Officer’s findings that Petitioner had committed three separate TESO violations, and imposed one-month suspensions for each of the first two violations and a *162 three month suspension for the third violation, such periods to run consecutively.
As an initial matter, Petitioner argues that Council lacked the authority to vacate or modify Resolution 028-02. In addition, citing Article III, section 3 of the Tribal Constitution. Petitioner contends that he did not receive the 12 hours of advance notice of the April 10 meeting to which he claims he was entitled as a purported Member of the Council. Both of these arguments fail.
1. The Council’s Authority to Revoke Resolution 028-02 and Adopt Resolution 064-02.
Petitioner contends that, assuming that Resolution No. 028-02 “failed” due to Council Member Reibach’s alleged conflict, the Council had “no authority” to consider the matter again. He cites two bases for this argument, neither of which provides pounds upon which to disturb the Council’s decision.
First, Petitioner asserts that “TESO granted no authority to Tribal Council to vacate the January 30th decision or modify that decision.” However, Tribal Council derives its power from the Tribal Constitution, not the TESO. The Tribal Constitution grants the Council broad authority, including “all legislative authority, except that vested in the General Council, and all executive authority of the Tribe.” Tribal Const., Art III, § 1 (emphasis supplied). Pursuant to that broad grant of authority, the Council clearly had the power to vacate or modify its earlier resolution, whether or not TESO expressly speaks to that issue. Furthermore, even if the earlier resolution were somehow7 infirm, it remained “valid and binding until set aside by legal proceedings instituted for that purpose.” 6 McQuillan, Municipal Corporations § 20.14 (3d ed. rev. 1998); see, e.g., Regency Park, LP v. City of Topeka, 267 Kan. 465, 981 P.2d 256, 262 (1999); City of Wilwer v. Laidlaw Waste Sys., Inc., 890 S.W.2d 459, 464 (Tex.App.—Dallas 1994). In other words, it was “voidable,” not “void.”
This conclusion is reinforced by judicial opinions arising from similar facts. For example, in Aetna Life Insurance Co. v. Lavoie, 475 U.S. 813, 106 S.Ct. 1580, 89 L.Ed.2d 823 (1986), an Alabama Supreme Court Justice who had east the deciding vote and written the opinion below had a disqualifying conflict of interest, in that he personally had pending a separate lawsuit that presented all of the same issues as the matter he was considering. Id. at 823-24, 106 S.Ct. 1580. A conflict of interest thus arose by virtue of the fact that the Justice’s opinion “had the clear and immediate effect of enhancing both the legal status and the settlement value of his own case.” Id. at 824, 106 S.Ct. 1580. Upon finding a disqualifying conflict of interest, however, the U.S. Supreme Court did not invalidate the Alabama Supreme Court’s decision, as Petitioner asks the Court to do here. Rather, the Supreme Court vacated the decision and remanded to the Alabama Supreme Court, which reconsidered the appeal and reached essentially the same conclusion as it had reached previously. See Aetna Life Ins. Co. v. Lavoie, 505 So.2d 1050 (Ala.1987). Similarly here, even assuming that Council Member Reibach were found to have had a conflict, the proper judicial remedy would have been to remand to the Council for reconsideration. That is precisely what the Council did of its own accord when it adopted Resolution 064-02 on April 10.[7]
*163 Second, Petitioner argues that the Council lacked authority to consider a new resolution while his appeal was pending in Tribal Court. Petitioner, however, cites no relevant authority to support his position. Rather, he cites cases applying Rule 60(a) of the Federal Rules of Civil Procedure to determine whether agencies may correct clerical errors in decisions that are on appeal. See, e.g., Chicano Educ. & Manpower Servs. v. United States Dept. of Labor, 909 F.2d 1320, 1328 (9th Cir.1990); Zenith Electronics Corp. v. United States, 884 F.2d 556, 561 (Fed.Cir.1989); Pan Am. Petroleum Corp. v. Federal Power Comm’n, 322 F.2d 999, 1004 (D.C.Cir.1963). Such cases have no application where, as here, the agency is actually vacating its prior action and issuing an entirely new decision. As previously established, such action is clearly within an agency’s inherent authority. See, e.g., Climax Molybdenum, 703 F.2d 447; Taylor, 528 F.2d 60; see also Belville Mining Co. v. United States, 999 F.2d 989, 998-99 (6th Cir.1993). The case is even stronger for the Tribal Council than it would be for a typical administrative agency, because the Council possesses “the power to exercise all legislative authority, except that vested in the General Council, and all executive authority of the Tribe.” Tribal Const., Art III, $ 1 (emphasis supplied). Nothing in the Tribal Constitution or the Tribal Code suggests that “leave of court was necessary” before the Council could exercise its authority to vacate or modify Resolution 028-02, as Petitioner suggests. As a result, the Council was free to adopt Resolution 064-02.
2. Whether Petitioner Was Entitled to and Received the Twelve Hours’ Advance Notice of the April 10 Meeting to Which Council Members are Entitled.
Citing Article III, section 3 of the Tribal Constitution, Petitioner contends that he was denied the “twelve (12) hours notice” of the Special Council meeting to which sitting Council Members are entitled. As an initial matter, however, as a result of Resolution 028-02, Petitioner was suspended, from the Council at the time of the April 10 meeting. That suspension obviously carried with it a temporary termination of the rights and privileges otherwise afforded to sitting Council Members, including whatever rights to notice that Members are entitled pursuant to Article III, section 3 of the Tribal Constitution.[8]
Furthermore, even if Petitioner were a sitting Council Member on April 10, he nevertheless received adequate notice of the April 10 meeting. The constitutional provision Petitioner cites does not specify what type of notice must be given to Council Members. Lauri Smith, the Council’s Administrative Assistant, provided notice of the April 10 meeting in accor *164 dance with her normal procedures by posting a draft agenda on the outside doors of the Tribe’s Governance Center: and the doors leading to the Tribal Council Offices more than 24 hours in advance of the scheduled meeting. There was only one entry under the agenda’s “New Business” heading: “Ed Pearsall Ethics Sanctions— resolution.” The notice apparently served its purpose, as the meeting was attended by several Tribal members and all sitting Council Members except for Mr. Pearsall. The posting provided at least constructive notice and, according to Ms. Smith, is the only form of notice that is regularly provided to each Council Member.
in short, on April 10, 2002, Petitioner was suspended from the Council and thus was not entitled to the notice afforded to sitting Council Members pursuant to Article III, section 3 of the Tribal Constitution. Furthermore, even if Petitioner was entitled to notice of the April 10 meeting, Ms. Smith’s posting was sufficient.[9]
C. Assignment of Error No. 3: Whether Petitioner was Deprived of Constitutionally Required Notice and an Opportunity to be Heard at a Meaningful Time and in a Meaningful Manner.
Petitioner’s third assignment of error asserts that his due process rights were violated because the Council allegedly failed to provide him with notice or an opportunity to be heard at the Council’s April 10 meeting. The parties agree that Petitioner was entitled to “due process” in connection with his TESO proceedings, but disagree as to what process was due, and when. Petitioner contends that due process demanded that he be notified of, and permitted to participate in, the April 10 meeting. Respondent argues that Petitioner was afforded an adequate opportunity to be heard at other stages in the process-including at the hearing before Judge Flint Knife—and that due process did not require Council to afford Petitioner a second opportunity to present his case at the April 10 meeting.
 As an initial matter, it is well established that “[procedural perfection in administrative proceedings is not required.” Mays v. Bowen, 837 F.2d 1362, 1364 (5th Cir.1988). This Court held in heno that a Council Member accused of TESO violations is entitled only to “the opportunity to be heard at a meaningful time and in a meaningful manner.” Leno, 27 ÍLR at 6215 (citing Armstrong v. Man-zo, 380 U.S. 545, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965)).
The linchpin of Petitioner’s argument, repeated throughout the Amended Brief, is that he was denied “due process” because he was allegedly not permitted to *165 be heard or to present witnesses at the Council’s April 10 meeting. The main problem with this argument is that due process does not require that Petitioner be heard at each and every stage in the sanction process. As the United States Supreme Court has made clear, “[t]he demands of due process do not require a hearing, at the initial stage or at any particular point or at more than one point in an administrative proceeding so long as the requisite hearing is held before the final order becomes effective.” Opp Cotton Mills, Inc. v. Administrator of Wage & Hour Div., 312 U.S. 126, 152-53, 61 S.Ct. 524, 85 L.Ed. 624 (1941) (emphasis supplied); see also Hunter v. Supreme Court of New Jersey, 951 F.Supp. 1161, 1181 (D.N.J.1996) ( “Due process does not require a hearing before a particular decision maker, or a hearing at more than one step in the process.”).
Here, there is no question that those basic due process standards were satisfied. Petitioner participated in a lengthy eviden-tiary hearing before the Hearings Officer on December 18, 2001, where he was represented by counsel and permitted to call witnesses. In addition, he was permitted to submit to the Hearings Officer a motion to dismiss the claims against him prior to the hearing, and a written “closing argument and memorandum of law” following the hearing. Finally, after Petitioner submitted those documents, the Hearings Officer prepared a detailed 23-page opinion and a 5-page “Supplemental Final Order” detailing his findings and recommendations, and the Council relied on those detailed findings in rendering its decision. Petitioner was present at and participated in the January 30 meeting at which Council adopted Resolution 028-02. Taken together, this process was more than adequate to satisfy Petitioner’s right to due process, and whether or not he was later invited to participate at the Council’s April 10 review of the Hearings Officer’s findings is simply of no moment.
This conclusion is reinforced by the opinions of several courts that have faced similar factual situations. For example, in Marinangeli v. Lehman, 32 F.Supp.2d 1 (D.D.C.1998), the Patent and Trade Office (“PTO”) instituted proceedings to disbar an attorney who had been convicted of a “crime of moral turpitude.” Following a hearing at which the attorney was permitted to produce written evidence and call witnesses, an administrative law judge (“ALJ”) issued an initial decision suspending the attorney from practicing before the PTO for two years. Id. at 4. The attorney appealed the decision to the Commissioner of Patents and Trademarks who, like the Tribal Council in this matter, was the ultimate decision-maker. The Commissioner, based solely on a review of the record of the proceedings before the ALJ, issued a final decision adopting the two-year suspension for the reasons stated in the ALJ’s order. Id. at 4. The attorney appealed the Commissioner’s decision to the United States District Court, contending, inter alia, that “he was denied an oral hearing before the Commissioner.” Id. at 8.
Citing Opp Cotton Mills, the court rejected the attorney’s argument and held that the attorney was “not entitled to a second hearing.” Id. Like the attorney in Marinangeli, Petitioner “was permitted to introduce exhibits, call witnesses, and testify before the [Hearings Officer 1.” Id. That amounted to the “meaningful hearing” to which he was entitled. Id. Furthermore, like the regulation at issue in Mari-nangeli, TESO requires a hearing-before the Hearings Officer, see Tribal Code § 275(f)(1)(E), but does «oí require any hearing before the Council. Compare Marinangeli, 32 F.Supp.2d at 8 (regulation required hearing before ALJ, but not before the Commissioner). Accordingly, like *166 the attorney in Marinaugeli, Petitioner was “not entitled to a second healing before the [Council] and there is no due process violation.” M
The Hunter case also presented similar facts. There, a state trial court judge brought an action challenging a reprimand imposed on him by the New Jersey Supreme Court, which had based its reprimand decision on the recommendation and record provided to it by New Jersey’s Advisory Committee on Judicial Conduct (“Committee”). The Committee had held a hearing during which the accused judge “had the opportunity to make a statement, produce documents, and present witnesses. The Supreme Court reviewed the Committee’s recommendation and the record and issued its decision.” Hunter, 951 F.Supp. at 1181. The judge challenged the decision, alleging, infer alia, that he had been denied “a pre-determination hearing before the Justices of the New Jersey Supreme Court, or any judicial forum.” Id. The court disagreed, holding that “[d]ue process does not require a hearing before a particular decision maker, or a hearing at more than one step in the process.” Id. The hearing before the Committee—like Petitioner’s hearing before the Hearings Officer—satisfied due process.
In sum, the proceedings before Judge Flint Knife provided Petitioner “the opportunity to be heard at a meaningful time and in a meaningful manner.” Leno, 27 ILR at 6215. In addition, Petitioner attended and participated in the January 30, 2002 meeting at which Resolution 028-02 was adopted. Furthermore, as discussed above, Ms. Smith posted notice of the April 10, 2002 meeting at which Resolution 064-02 was adopted, and there is no evidence that Petitioner was refused entry to that meeting. Under the circumstances, Petitioner had more than sufficient opportunity to be heard. His due process rights were satisfied.
I). Assignment of Error No. 4: Whether Petitioner’s Right to a Fair and Impartial Hearing Was Violated as a Result of Judge Flint Knife’s Alleged “Bias” and Purported “Ex Parte Communications.”
Petitioner’s fourth assignment of error broadly contends that he was denied “a fair and impartial hearing before a fair and impartial Judge.” However, for the reasons stated in the August 26, 2002 Memorandum in Support of Respondent’s Motion to Strike, the Court, by Order dated November 5, 2002, struck from the record “[a]ll evidence relating to alleged ‘bias’ on the part of the Hearings Officer.” Consequently, the fourth assignment of error should not even have been raised in the Amended Brief.
Even assuming that the issues was properly raised, however, Petitioner has not made anything close to the showr-ing of improper behavior necessary to overturn a judicial officer’s ruling. “[Normally there must be a strong showing of bad faith or improper behavior before the court may [even] inquire into the thought processes of administrative decisionmak-ers,” much less overturn a decision. Animal Def. Council v. Hodel, 840 F.2d 1432, 1437 (9th Cir.1988) (quotation omitted). And in order to prevail on a claim of bias, a litigant must ordinarily show “an unacceptable probability of actual bias on the part of those who have actual decision making power.” United States v. Oregon, 44 F.3d 758, 772 (9th Cir.1994); see also United States v. Nelson, 54 F.3d 1540, 1545 (10th Cir.1995); see also Navistar Int’I Transp. Corp. v. EPA, 941 F.2d 1339, 1360 (6th Cir.1991) (“[A]ny alleged prejudice on the part of the decision maker must be evident from the record and can *167 not be based on speculation or inference ”) Here, Petitioner has failed to make any showing of bad faith or improper behavior on Judge Flint Knife’s part. Instead, he vaguely alleges that Judge Flint Knife was “biased” and contends that he engaged in inappropriate “ex parte communications” with Council.
For example, Petitioner references alleged ethics charges relating to Judge Flint-Knife’s tenure as Chief Judge of the Yakima Tribe. Those issues, however, are completely irrelevant to Judge Flint Knife’s performance in this matter. [10] Furthermore, in light of the fact that the Council was responsible for appointing Judge Flint Knife, see Tribal Code § 275(f)(1)(C), it is hardly surprising that he corresponded with the Council with respect to non-substantive administrative issues, nor is that correspondence a proper-basis upon which Plaintiff may challenge the Hearings Officer’s findings. Cf 5 USC § 557(d) (Federal Administrative Procedure Act prohibits ex parte communications only insofar as they are “relevant to the merits of the proceeding”); United States v. Skulsky, 786 F.2d 558, 561 (3d Cir.1986) (no prejudice arose from ex parte communications involving procedural matters, as opposed to communications discussing substance of the underlying proceedings). Moreover, Council was not even a party to Petitioner’s underlying ethics proceeding. Consequently, Judge Flint Knife’s communications with Council cannot even properly be deemed “ex parte communications.”
In short, nothing in the Amended Brief establishes the type of “bias” necessary for this Court to find that Petitioner was denied the right to a fair hearing. Indeed, in Stands Over Bull v. Bureau of Indian Affairs, 442 F.Supp. 360 (D.Mont.1.977), the court upheld the Crow Tribe’s removal of its Tribal Chairman, despite the Chairman’s allegation that he was denied the opportunity to confront and cross-examine witnesses, was precluded from presenting evidence or sworn testimony from nonmembers of the Tribe, and was “not afforded an impartial tribunal.” Id. at 365. The court broadly held that “[t]he plaintiff had no right to a hearing before an impartial tribunal.” Id. at 376.
This Court need not reach that far. Unlike the plaintiff in Stands Over Bull, Petitioner was afforded a fair hearing with the opportunity to cross-examine adverse witnesses and present witnesses of his own. He was afforded “the opportunity to be heard at a meaningful time and in a meaningful manner.” Leno, 27 ILR at 6215.[11] Following that hearing, the Hear *168 ings Officer delivered a comprehensive 23-page opinion documenting his thorough findings of fact and conclusions. Petitioner does not substantively challenge a single one of those findings or conclusions. In short, there is simply no basis upon which to conclude that Petitioner was denied a fair and impartial hearing before a fair and impartial judge.
E. Assignment of Error No. 5: Whether the Ethics Complaint Filed by Jan Michael Reibaeh Was Sufficient as a Matter of Law to State a Violation of TESO.
Petitioner’s fifth assignment of error contends that “[t]he ethics complaint filed by Mr. Reibaeh Jr. was insufficient to state as a matter of law actional [sic] violations, individually or collectively, of the Tribal Ethics Ordinance.” Petitioner’s Amended Brief cites no authority for this proposition, nor does it even catalogue the alleged deficiencies in Mr. Reibaeh’s complaint. Instead, the Amended Brief purports to “incorporatef ] by reference” arguments made in Petitioner’s Motion to Dismiss, which he filed with the Hearings Officer on November 12, 2001.
For two reasons, the Court will not even consider this argument. As an initial matter, the argument was not raised in Petitioner’s Opening Brief and is therefore barred by this Court’s November 5, 2002 Order which expressly stated that, with one exception not relevant here, “Plaintiffs amended opening brief shall not raise any assignment of error that was not raised in Petitioner Ed Pearsall Opening Brief.” Cf. United States v. Garcia,, 149 F.3d 1008, 1010 (9th Cir.1998); Omega Envtl., Inc. v. Gilbarco, Inc., 127 F.3d 1157, 11(57 (9th Cir.1997). Furthermore, courts have repeatedly and consistently refused to permit parties to merely “incorporate” into their appellate briefs arguments made in briefs below, as Petitioner has done here. Such arguments are deemed waived unless fully developed in the appellate brief. See, e. g., Gaines-Tabb v. ICI Explosives, USA, Inc., 160 F.3d 613, 623-24 (10th Cir.1998); Cay Comms., Inc. v. Novatel Computer Sys., Inc., 33 F.3d 390, 396 n. 6 (4th Cir.1994); Frazier v. Garrison ISD, 980 F.2d 1514, 1527-28 (5th Cir.1993); Acosta-Huerta v. Estelle, 7 F.3d 139, 144 (9th Cir.1992). For these reasons, Petitioner has waived his argument that the original ethics complaint was deficient.
F. Assignment of Error No. 6: Whether the Council May Suspend Members Who Violate TESO.
Petitioner contends in his sixth assignment of error that the Council lacks the authority to suspend Council Members for violations of TESO. Once again, however, Petitioner fails to cite any authority for that proposition. Moreover, the plain language of the Tribal Constitution and TESO belie Petitioner’s argument.
As previously noted, the Tribal Constitution confers upon the Council extremely broad authority, including all of the Tribe’s executive and legislative authority, except to the extent that the Tribal Constitution expressly vests specific legislative authority in the General Council. See Tribal Const., Art III, § 1. The Tribal Constitution vests in the General Council the power to elect and to recall Council Members. See id., Art II, § 1(a), (d). The Constitution, however, is silent with respect to the power to discipline Council Members who violate tribal ethics standards. Be *169 cause the Constitution does not expressly vest that right in the General Council, it is within the constitutional purview of the Tribal Council. Indeed, this Court has previously recognized that “[t]he Tribe’s interest in governing the ethical conduct of its owm Council Members is a compelling one, going to the heart of Tribal sovereignty and self-government.” Leno, 27 ILR at 6216. Accordingly, “[t]he Tribal Council must have the authority and the freedom to establish standards governing the conduct of its members.” Id. The Council adopted those “standards” when it enacted TESO, expressly providing that “[a]ppro-priate sanctions against a Tribal Council Member found to have committed an ethical violation under this Ordinance include * * * temporary suspension (not to exceed three (3) months).” Tribal Code § 275(f)(l)(I).[12] Thus, contrary to Petitioner’s assertion in his sixth assignment of error, the Council is authorized to suspend Council Members who violate TESO.
G. Assignment of Error No. 7: Whether Council is Authorized to Withhold Compensation from Members During the Period of their Suspension.
Petitioner contends in his seventh assignment of error that even if the Council is empowered to suspend Members for TESO violations, it has no power to suspend without pay. Petitioner’s sole basis for this argument is that TESO provides only for the possibility of “suspension,” but does not expressly authorize suspension “without pay.” To the extent TESO is ambiguous on this issue, however, it is important to note that Council enacted TESO and is charged with administering it. Consequently, the Court must defer to the Council’s interpretation of TESO unless it is clearly unreasonable. Cf. Chevron, USA, Inc. v. Natural Resources Defense Council, 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) (“We have long recognized that considerable weight should be accorded to an executive department’s construction of a statutory scheme it is entrusted to administer, and the principle of deference to administrative interpretations.”) (Footnote omitted.); see also id. at 843 n. 11, 104 S.Ct. 2778 (“The court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding.”) (Citations omitted.)
Here, the Council’s interpretation is not “clearly unreasonable.” Indeed, similar statutory schemes recognize that a “suspension” naturally includes a temporary deprivation of the rights, privileges, and accoutrements of office, including pay. Cf. Greenleaf v. DHH, Metro. Dev. Ctr., 594 So.2d 418, 423 n. 1 (La.App.1991); State v. State Personnel Bd. of Review, No. 86AP-270, 1987 WL 17808, at *3 (Ohio App. 10 Dist., Sept. 29,1987).
The Supreme Court of Iowa considered this precise issue in Northeast Community Education Association v. Northeast Community School District, 402 N.W.2d 765 (Iowa 1987). There, a teacher contended that the school district exceeded its powers when it suspended him without pay. Id. at 768-69. The statute at issue in that case granted public employers “the power to [sjuspend * * * public employees for proper cause,” but was “silent as to whether the suspension may be with or without *170 pay.” Id. at 769 (quotation omitted). The court’s analysis began with its recognition that, "[i]f a statute is ambiguous, the court, in determining the intent of the legislature, may consider among other matters the object sought to be attained by the statute.” Id. (citation omitted). Those objects included “maintam[ing] the efficiency of governmental operations” and “taking such actions as may be necessary to carry out the mission of the public employer.” Id. (brackets in original). The court held that “[t]he power to impose suspensions without pay [was] in harmony with” those objects. Id. Indeed, the Iowa Supreme Court held that it would be “absurd” to interpret the applicable statute as authorizing only suspensions with pay. Id. Under such a scheme, a suspended official would, “[i]n effect, * * * be rewarded for misbehavior,” id., by receiving a “penalty” that amounted essentially to a paid vacation.
Similarly, TESO was enacted to further the Tribe’s “interest in governing the ethical conduct of its oto Council Members,” an interest that this Court has described as a “compelling one, going to the heart of Tribal sovereignty and self-government.” Leno, 27 ILR at 6216. The Council’s ability to withhold pay from suspended Members is “in harmony with” that important interest. Northeast Comm. Educ. Ass’n, 402 N.W.2d at 769, Indeed, the Council has previously withheld pay from suspended Members. See, e.g., Leno, 27 ILR 6213 (upholding two-month suspension without pay). In light of the policies underlying TESO and the substantial deference owed to the Council’s interpretation of that ordinance, the Council acted within its authority in withholding Petitioner’s compensation during the period of his suspension.
II. Assignment of Error No. 8: Whether the Terms of Petitioner’s Suspension Amount to an Unconstitutional “Excessive Fine.”
The Council agreed with the Healings Officer’s conclusion that Petitioner had committed three separate violations of the TESO, and imposed 1 month suspensions for each of the first two violations and a three month suspension for the third. Once again failing to cite any supporting authority, Petitioner contends that the five-month suspension without pay amounts to an “excessive fine” in violation of the Indian Civil Rights Act.[13]
As an initial matter, the Council did not impose a “fine” on Petitioner. It suspended him. That suspension carried with it negative financial implications, but the Council did not independently “fine” Petitioner. The financial consequences were incidental to the suspension and cannot themselves be subjected to a constitutional “excessive fine” analysis. See, e.g., Seaver v. Commandant, U.S. Disciplinary Barracks, 998 F.Supp. 1215 (D.Kan.1998) (rejecting service member’s claim that loss of military pay and benefits accompanying his confinement constituted an “excessive fine”).
Moreover, even if the financial consequences of Petitioner’s suspension could be characterized as a “fine,” Petitioner has *171 ottered nothing to support his claim that the penalty was “excessive” in a constitutional sense. Again, the question is not whether the Court, considering the issue de novo, might impose a lesser sanction. Rather, the Court may overturn the sanction only if it somehow violates the Tribal Constitution or the Indian Civil Rights Act. In that regard, a fine is constitutionally “excessive’ only if it is grossly disproportional to the [offense] committed.” Wright v. Riveland, 219 F.3d 905, 916 (9th Cir.2000) (emphasis supplied); see also Hindt v. State, 421 A,2d 1325, 1333 (Del. Supr.1980) (“For a fine to be unusual or excessive, it must be so disproportionate to the offense as to shock public sentiment and contrary to the judgment of reasonable people concerning what is proper under the circumstances” (quotation omitted)). Petitioner offers no basis upon which the Court could reasonably conclude that a five-month suspension is an “excessive” penalty for three separate violations of TESO. On April 10, 2002, after considerable public debate over the course of several months, the voting Members of the Tribal Council—including two Members who voted against the original seven month sanction—unanimously concluded that a five-month suspension without pay was appropriate under the circumstances. The Court will not disturb that determination.
Although the Court has found that the Tribal Council had the authority to suspend Petitioner without pay and that this does not amount to and unconstitutionally excessive fine the Court does so with some reluctance.
The transgressions found by the hearing officer appear to be relatively minor and some of the circumstances leading to the altercation and suspension do not reflect well on the complaining witness or the Tribal Council.
The record will show that the Court considered sending this controversy back to the Tribal Council on this issue before deciding that doing so would exacerbate the controversy.
The above remarks are made from a sense of despair at the extent to which this dispute has escalated and apparently affected the tranquility of individual and Tribal relations. There is plenty of shared fault and misunderstanding. The Court urges the parties to renew efforts to achieve an acceptable resolution, preferably with the aid of a mutually acceptable mediator.
IV. CONCLUSION
For all of the reasons stated herein, the Tribal Council’s April 10, 2002 resolution imposing upon Petitioner a five-month suspension without pay is affirmed.

. Jan Michael Reibach is the son of Council Member Jan D. Reibach.

. The Hearings Officer issued a clarifying "Supplemental Final Order” on January 26, 2002.

. At an earlier hearing in this matter, Petitioner’s counsel asserted that all members of the Tribe are entitled to at least some notice of every Council meeting, and claimed that Petitioner did not receive such notice with respect to the Council's April 10 meeting. Because that issue had been raised at the earlier hearing, the Court granted Petitioner leave to raise it in his Amended Brief even though he had not raised it in his Opening Brief. Nevertheless, Petitioner apparently chose to abandon that argument in his Amended Brief In anv event, as established infra, sufficient notice of the April 10 meeting was provided to the Tribe.

. The issues raised for the first time in the Amended Brief include: (i) the allegation that the original ethics complaint filed by Jan Michael Reibach “was insufficient to state as a matter of law actional fsicf violations”; (ii) the assertion that Resolutions 028-02 and 064-02 were invalid because they had not been prepared at least 24 hours before the Council meeting at which they were adopted; (iii)-the contention that “there:was no.notice and an opportunity (or Councilor Pearsall and his attorney to be heard" at a January 28, 2002 Tribal Council Committee meeting or at a January 30 Council meeting; (iv) the allegation that the Tribal Council Chair failed to approve the agenda for a Special Tribal Council meeting at least 24 hours in advance of the meeting; and (v) the allegation that an April 10, 2002 meeting of the Tribal Council Economic Development Committee was not "validly convened" and that Petitioner did not receive notice of that meeting. In addition, the Amended Brief continues to assert that *160 Petitioner was denied “a fair and impartial hearing” due to alleged bias on the part of the Hearings Officer, an issue that this Court previously held to be irrelevant. Each of these claims is barred pursuant to the Court’s November 5, 2002 Order.

. The Tribal Constitution confers upon the Council extraordinarily broad authority, including, inter alia, "the power to exercise all legislative authority, except that vested in the General Council, and all executive authority of the Tribe.” Tribal Const. Art III, § 1.

. The Amended Brief also contends, in passing and without any explanation or supporting authority, that "lt]he votes of Councilors Leno and Haller should not have been cast.” The Court need not even consider those con-clusory allegations, which are unsupported by fact, argument or legal authority. See, e.g., Martinez v. Wilson, 32 F.3d 1415, 1421 n. 7 (9th Cir.1994); Williams v. United States Dep’t of Labor, 879 F.2d 327, 331 (8th Cir.1989).

, Similarly, municipal legislative bodies may ratify their void acts, see, e.g., In re Citv of San Benito. 63 S.W.3d 19 (Tex.App.Corpus Christi 2001); Bale v. City of Auburn, 87 Wash.App. *163 205, 941 P.2d 671 (1997), or may cure the defective enactment of an ordinance by a subsequent enactment, see, e.g., Paliotto v. Dickerson, 22 A.D.2d 929, 256 N.Y.S.2d 55 (N.Y.App.Div.1964); Piper v. Moore, 163 Kan. 565, 183 P.2d 965 (1947).

. As discussed, supra, this would be so even it Resolution 028-02 were somehow infirm as a result of Council Member ReibachV alleged conflict of interest. Where a body, like the Council, "has power to pass [an] ordinance for a certain purpose, but exercises that power in an unauthorized manner, the ordinance is valid and binding until set aside by legal proceedings instituted for that purpose.” 6 McQuillan, Municipal Corporations §20.14 (3d ed. rev. 1998) (emphasis supplied). Thus, even if the January 30 vote imposing the original suspension were somehow improper, Resolution 028-02 would not have been "void” as of April 10, but rather merely “voidable,” pending judicial review. See, e.g.. Regency Park, 981 P.2d at 262; City of Wilmer, 890 S.W.2d at 464.

. Even it Petitioner could demonstrate that he was entitled to but did not receive the notice envisioned by Article III, section 3, there is no evidence in the record indicating that the results of the April 10 vote would have been any different. As reflected in the minutes of the April 10 meeting, Council was aware that the January 30 vote had created a great deal of "controversy" and "hostility” among Tribal members. Nevertheless, the Council voted unanimously on April 10 to suspend Petitioner for five months. Petitioner has offered nothing to indicate that something new might have been presented to the Council on April 10 to change its collective decision, which was reached after two months of turmoil. As such, any procedural error relating to the April 10 meeting was simply harmless error. "The major policy underlying the harmless error rule is to preserve judgments and avoid waste of time.” Mays v. Bowen, 837 F.2d 1362, 1364 (5th Cir.1988). Thus, even assuming Petitioner’s notice arguments had merit, it would be inappropriate for the Court to remand the Council's decision, because doing so “would produce the same result while wasting time and resources.” Id.

. Plaintiff also weakly alleges in his Brief that Judge Flint Knife, by continuing as the Hearings officer after resigning his position with the Yakima Tribe, “violatied] the expectation if not the contractual obligation, and Councilor Pearsall’s rights as an intended beneficiary, of having a sitting Tribal Judge in good standing to hear this matter.” However, nothing in the Tribal Code, the Tribal Constitution, or in Judge Flint Knife’s contract required him to be a ‘'sitting Tribal Judge in good standing” as a prerequisite to his participating as the Hearings Officer.

. Petitioner also complains that Judge Flint Knife improperly denied Petitioner’s motion to continue the December 18, 20.0.1. evidentia-rv hearing. But in administrative proceedings, “|i|t is well established that the grant or denial of a continuance is within the discretion of the ALJ and will not be overturned absent a clear showing of abuse.” Fitzhugh v. DEA, 813 F.2d 1248, 1252 (D.C.Cir.1987) (quotation omitted); see also NLRB v. Pan Scape Corp., 607 F.2d 198, 201 (7th Cir.1979). “An abuse of discretion will be found only where the grant or denial of a continuance 'is demonstrated to clearly prejudice the appealing party.' ” Fitzhugh, 813 F.2d at 1252 (quoting Pan Scape, 607 F.2d at 201). The sole basis for Petitioner's motion for a continuance was to seek additional time to inquire into Judge Flint Knife’s status with the Yakima Tribe. As *168 discussed supra, that issue is entirely irrelevant to Petitioner's appeal. Consequently, there is simply no basis upon which to eon-clude that Judge Flint Knife abused his discretion in denying Petitioner's motion for a continuance.

. The Hearings Officer concluded, and the Council agreed, that Petitioner had committed three separate violations of TESO, each of which carried a 3-month maximum period of suspension. Petitioner does not contend that his 5-month suspension exceeds the maximum period permitted by Tribal Code § 275(f)(l )(I).

. Petitioner also suggests that the suspension—which had the effect of depriving Petitioner of approximately $25,000 of compensation—violated the portion of the Indian Civil Rights Act that precludes Tribes from "im-pos( ing 1 for conviction of any one offense any penalty or punishment greater than imprisonment for a term of one year and a line of $5,000, or both.” 25 USC § 1302(7) (emphasis supplied). However, the Council’s conclusion that Petitioner violated TESO is not a "conviction" within the purview of that provision. See generally Black’s Legal Dictionary (6th ed. 1990) (defining ‘‘conviction” as "the result of a criminal trial which ends in a judgment or sentence that the accused is guilty as charged" (emphasis supplied)).